## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **MORGAN A. KATELIN PEARSON, and** | ) | |
| **KIRSTEN ELIZABETH KIRKPATRICK,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No: 4:16-CV-1450** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LOGAN UNIVERSITY d/b/a LOGAN** | ) | |
| **COLLEGE OF CHIROPRACTIC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

Plaintiffs Morgan A. Katelin Pearson and Kirsten E. Kirkpatrick state the following in Response to Defendant Logan University's Motion and Memorandum in Support of Summary Judgment (Docs. 58 & 59):

### OVERVIEW

From a proverbial "30,000 foot view," Defendant treated and disposed of Ms. Pearson's Title IX claim in a proper manner -- Defendant's Title IX Coordinator listened to Ms. Pearson's complaint, conducted an investigation, and then presented the case to Defendant's "Student Honor Council," which found against Ms. Pearson.  However, a closer look at the underlying factual circumstances reveals countless factors rendering the investigation and disposition of her Title IX claim so grossly deficient and so infected with impropriety and bias as to easily meet the "deliberate indifference" standard required to make out a violation of Title IX. As to Ms. Kirkpatrick, her claim is relatively simple -- despite complaining of actionable sexual harassment directly to Defendant's Title IX coordinator, Defendant effectively ignored her claim, undertaking *no investigation at all*.  Logan unquestionably violated Title IX as to both Plaintiffs.

Yet there is more to this case than Plaintiffs' personal circumstances. The facts show that during the time Plaintiffs attended Logan University, and for at least multiple years before then, Logan had developed a disturbing pattern and practice of systematically covering up sexual violence against its female students. Logan's insistence on *perpetuating*, rather than correcting that pattern not only contributed to Plaintiffs' Title IX claims, but also gives rise to Plaintiffs' negligence and premises liability claims.

## FACTS

### *The Context of Logan's Rape Culture*

For many years, Logan has followed a pattern of practice of grossly failing to protect its female students to such a wide extent that the students openly discussed this fact.  During Plaintiff Pearson's (hereby referred to as "Plaintiff" unless otherwise noted) time at Logan, she knew multiple female students who endured acts of sexual harassment, sexual violence, and stalking by students and Logan employees; students had wide agreement, however, that complaining was futile as Logan would take no meaningful action. ***Plaintiffs' Statement of Uncontroverted Facts* (Doc. 68)("SOF) 166-175, 178-180**. This was perhaps not only by the administrators' culture surrounding complaints, as discussed *infra*, but also by a lack of security: only one security guard patrols Logan's campus at a time and it would take "ten minutes" to walk across Logan's campus in the event of an emergency. **SOF 126-127**.

As such, Kim Hartmann, former alumni director of Logan University from 2011 to 2015, stated that she had a conversation with former Title IX director, James Paine, in which she contends that Logan administrator's would actively dodge complaints of sexual deviancy, embarrass the girls who had come forward, and threaten them with being expelled. **SOF 151(a), 98-99**[1]  Meanwhile, James Paine's role as Title IX coordinator also made him responsible for

---

[1] Dr. Hartmann contends: "He [James Paine] had -- and I remember this conversation distinctly because it was just stunning, like shocking what he was telling me.  He had said that he one or more girls that had come to him and complained about sexual harassment things in nature.  But it related to a board member.  And so he [James Paine] would ask the girls to go upstairs and

fielding Title IX complaints yet even his supervisor Boyd Bradshaw relayed his lack of follow through in regard to student complaints. **SOF 144(a)(c), 145(a), 146**.[2]

### *Facts Relating to Plaintiff Morgan A. Katelin Pearson*

Plaintiff had wanted to attend Logan University from a young age. **SOF 112**. As such, Plaintiff applied to Logan University's undergraduate program during her senior year of high school, and began attending Logan University in September of 2015. **SOF 1-2**. Before starting the school year, Plaintiff attended Logan University's orientation program, which hosted approximately 140 new students. **SOF 3**.

Plaintiff, a 5'3 underage woman of slight build, first met Male Student, a 31 year-old, 6'1 undergraduate, on September 8, 2015. **SOF 5**, **181-182**, **183**. She was immediately intimidated by Male Student's size, age, aggressive, and disturbing demeanor towards her, and thus Male Student quickly began to make Plaintiff uncomfortable. **SOF 184**. On the first day of classes, Plaintiff was giving her phone number to another female student when Male Student interrupted them, put his phone in Plaintiff's face, and told her to give him her number. **SOF 185**. Plaintiff, off guard and taken aback, but not anticipating much harm, gave Male Student her phone number. **SOF 186**. Within two days, Male Student began sending lewd, offensive, and threatening text messages, making her increasingly upset. **SOF 107**, **187-190, 106, 195, 198**.[3]

---

speak with Doctor George Goodman [former president of Logan University who is now deceased]. And apparently [Goodman's] wife who also worked at the college at the time had intervened and told [...] more than one [...] gir[l] that if they went any further with the matter they would have -- she would have them expelled [...] I guess I was stunned. I was shocked at what he was telling me [...] Mrs. Doctor Goodman would intervene. Tell them that if they were to speak to anybody about the incident, she would have them expelled and they would not be able to basically apply or get into any other chiropractic college." She further clarifies that she did not further report this because "Doctor Goodman was [...] very forceful [...] It wouldn't have ended well." **SOF 151(a), 98-99**.

[2] He, however, had *inter alia* a "lack of follow-through [and] availability for the students," failed to complete a "performance improvement plan," simply "wasn't there" often or one "couldn't find him," and ultimately was fired after "never tak[ing] care of [duties]." **SOF 144(a)(c), 145(a), 146**.

[3] For instance, though Male Student requested Plaintiff's phone number under the guise of forming a "study group," Male Student had no such intention. **SOF 188**. In fact, Male Student invited Plaintiff over for beer when she was only 19 years-old; Plaintiff refused. **SOF 106**, **195**. In another instance, after Plaintiff had told him that she did not wish to study with him, Male Student disturbing responded by propositing Plaintiff, implying that he wanted to date Plaintiff and that it "it doesn't have to be serious." **SOF 189-190**.

Plaintiff did not respond to this text and attempted to ignore him thereafter. **SOF 191, 193**. However, Male Student continually texted Plaintiff anyway, despite Plaintiff doing nothing to further invite his communication; Plaintiff continually ignored these texts. **SOF 196-198**, **199**. Male Student's threatening behavior began to transcend text messages, however, as her persistently stalked Plaintiff. **SOF 199-202**.[4] Because of this, Plaintiff had to wait for a friend to accompany her to and from class due to her fear. **SOF 203**. This increased furthermore when Plaintiff began "work study" employment at Logan's library as he would show up to every one of Plaintiff's work shifts and threateningly glare at her. **SOF 204-220**.[5] Soon thereafter, classmates and family began noticing Male Student's threatening demeanor and Plaintiff's consequential, and persistent, distress. **SOF 96, 97, 176, 52, 108-110, 111, 115, 114, 125**.[6]

On November 12, 2015, Male Student sexually assaulted Plaintiff essentially *in public*, inside a classroom at Logan while surrounded by other students. This experience was

---

[4] After every class that they had together, Male Student would go out of his way to follow Plaintiff, attempting to walk with her - hurriedly leaving with her if she left quickly and/or lingering for excessive periods of time if she attempted to wait for the Male Student to leave before her. **SOF 199**.  This happened every single time, though Plaintiff made it increasingly clear that his advances, conversation, and mere presence was unwanted. **SOF 200, 201**. No matter what Plaintiff did, Male Student persisted, almost as if he was enjoying her reaction. **SOF 202**.

[5] After two weeks of working in the library, Male Student's attendance in the library began to coincide with all three of Pearson's work shifts, such that their library schedules were essentially synonymous. **SOF 208-9**.  This was despite the fact that Male Student rarely completed library-related activity. **SOF 210**. During his time in the library, Male Student would spend much of his time trying to sit next to Plaintiff and staring at her. **SOF 211-212**. With Male Student following her before class, after class, and during her work shifts, she had essentially nowhere to go on campus where he was not there; this continued well into January 2016 and thereafter. **SOF 213-215, 204-207**. More than just merely annoying, Male Student's demeanor became threatening and aggressive: he would engage in prolonged, threatening glares, stares, and possessive interactions in which he would imply that he was "jealous" when other students would talk to Plaintiff. **SOF 216-219**. This led to Plaintiff's near-constant fear of assault while on Logan's campus. **SOF 220**.

[6] Male Student's threatening demeanor became exceedingly obvious to classmates. Among others, Daniel Trout in particular began to notice Male Student's abnormal, inappropriate, and threatening behaviors against Plaintiff, specifically in the library. Meanwhile, others began noticing Male Student's threatening demeanor and Plaintiff's uncomfortability.  Zemcuznikov specifically noticed that there was "something wrong" with Plaintiff's body language when Male Student was in the same space. **SOF 96**. In one particular conversation, Plaintiff reported that she had to do something "before [he] rapes [her] and throws [her] in his trunk. **SOF 97**.  Moreover, Male Student was continually making other young women uncomfortable. **SOF 176**.
Though Plaintiff, many times and in many ways, continued to ask Male Student to leave her alone, Male Student did not stop. **SOF 52**.  This continued to the point that Plaintiff's family began noticing: Plaintiff's brother and sister instructed Pearson to stay away from Male Student; Plaintiff's mother bought her daughter a can of mace as Plaintiff was terrified; and her mother communicated a real fear for Plaintiff's safety. **SOF 108-110**.  At one point, Plaintiff was so scared that she would "go straight to class and then she'd leave," in fear that Male Student was going to hurt her. **SOF 111, 115**.  When Plaintiff was not at Logan, she was distraught at the thought of having to be on Logan's campus. **SOF 114**. Because of this, even Plaintiff's mother had to see a medical doctor because she was becoming overwhelmed with what was happening to Plaintiff. **SOF 125**.

humiliating, degrading, and further caused - and substantiated - her fear. **SOF 221-230**.[7] Not knowing where to turn, Plaintiff began to seek resources to alleviate her situation. **SOF 15, 231-235**.[8]

On December 8, 2015, Plaintiff met with Sandra Perriello to initiate her first complaint, to which Perriello insisted that Plaintiff "*ha[d]* been sexually harassed," noted Plaintiff's fear of retaliation, but requested that Plaintiff *write down* her complaint in order to look further into the situation. **SOF 7, 11, 236, 240, 12, 241, 243, 244, 14, 246, 247**.[9]   The next day, Plaintiff requested to meet with the "dean" because Plaintiff found out that Male Suspect planned on taking Plaintiff's exact schedule during the following trimester. **SOF 10, 236-237**. Perriello forwarded this request to Dean Shelley Sawalich, the dean hired only a few months prior, who responded by asking, "Did she send you [Perriello] a written statement [...] to review?" **SOF 9, 83**.

On December 9, 2015, Plaintiff met with Dean Shelley Sawalich in order to repeat her previous complaint, including that she had been sexually assaulted by Male Student. **SOF 4, 22, 249**. Furthermore, Plaintiff again noted that she was "terrified of being raped" and emphasized that Male Student was incessantly stalking her. **SOF 20, 253**. Sawalich undermined Plaintiff's

---

[7] That day, Plaintiff and Male Student were a cadaver lab, embalming a cadaver with many other students and an instructor.  As students crowded around the display table, though not to the extent that touching one another could not be avoided, Male Student pressed and held his crotch against her buttocks.  This lasted until Plaintiff was able to move away, which was longer than expected as she was directly in front of the cadaver with students standing on both sides of her. **SOF 221-230**.

[8] Mistakenly believing she was not entitled to help unless the Male Student committed an even more serious act, and even then believing that this would only come through the justice system, Plaintiff did not where to turn. **SOF 231**. There was little, if any, posting on campus of any literature regarding a female student's right to Title IX protection against harassment, what it comprised, who to contact if one was a victim of the same, or where to go if one were in need of help due to sexual harassment. **SOF 232**. Ms. Pearson lived in fear for months without knowledge of the existence of Title IX or Logan's obligation to provide her protection and counseling pursuant to it. **SOF 233**. Through "word of mouth," after confiding in enough people (which alone was difficult) about what had been happening to her, she learned about Title IX and that Logan was "supposed" to do something. **SOF 234**. Right around the same time Ms. Pearson learned of the fact Logan was at least entitled to provide her some protection, the situation with the Male Student also began to grow even worse. **SOF 235**.  Plaintiff, though unfamiliar with Title IX mandates at that current time, could not handle the harassment any longer. **SOF 15**.

[9] This complaint included that she had been sexually assaulted when Male Suspect pressed his genitalia against her, the text messages, and the non-stop stalking. **SOF 7, 11, 236, 240**. Plaintiff told Perriello that she was in "constant fear," "afraid of retaliation," and further exclaimed that she "terrified of retaliation" - Perriello wrote this important fact down in her notes. **SOF 12, 241, 243**.

complaint and behaved unprofessionally. **SOF 16, 250, 17-19, 23, 104. 45. 24. 251. 30, 113, 254**.
[10] In closing, Sawalich again asked Plaintiff to provide a written statement, stated that she could not "guarantee" Plaintiff's anonymity, and expressed that she would e-mail Plaintiff prior to meeting with Male Student to allow her to guard herself from any retaliation. **SOF 27**, **252**, **253**. That same day, Perriello again e-mailed Plaintiff to "remind" her that she "need[s] a statement from [her] about [her] issue with the other student." **SOF 8**.  On December 14, 2015, Plaintiff requested of Sawalich in an e-mail to turn in her statement the following week; Sawalich replied the next day by stating that, "what this means, though, is that I won't be able to move forward until next trimester with the investigation.  Is that okay with you?" **SOF 28**.  Meanwhile, and following Plaintiff's initial complaint on December 8, 2015, Male Student grew increasingly bolder. **SOF 256-274**. [11]

Upon the next trimester beginning, Male Student's stalking and sexual harassment continued.  **SOF  275-277**, **278-279**, **280**.[12]   Meanwhile, Shelley Sawalich, without telling Plaintiff, met with Male Student for the first time on January 9, 2016, after the second trimester had begun and before Male Student continued to sexually harass and stalk Plaintiff. **SOF 164**. Having not heard an update, Plaintiff e-mailed Sawalich on January 16, 2016, stating that "He continues to show up and make me uncomfortable, and I continue to feel unsafe at Logan." **SOF**

---

[10] Sawalich was "not so sure" that Plaintiff was being sexually harassed, contrary to Perriello's judgment. **SOF 16**, **250**. Instead, and to the extent that she did label Plaintiff's complaint, she labeled Plaintiff's complaint as that of harassment and stalking. **SOF 17**.  In fact, Sawalich deemed the sexual assault by Suspect an "accident" and further contended an attitude that "boys will be boys." **SOF 23**, **104**. Though Plaintiff, frustrated by Sawalich's response, was unsure of whether or not she wished to report the issue in fear of retaliation, Sawalich responded by stating that "if you wanted someone to talk to, you should have gone to see a counselor." **SOF 18-19**.
Sawalich stated that Pearson could be anonymous yet did not explain the limitations of being anonymous. **SOF 45**. To this, Plaintiff provided four witnesses for Sawalich's investigation when Sawalich requested such. **SOF 24**, **251**.  Sawalich also mentioned that she would not be able to move forward with an investigation because she had another Title IX complaint to "take care of." **SOF 30**, **113**, **254**.
[11] Such actions included the following: holding a door closed when Plaintiff was trying to enter a classroom, taking the seat next to Plaintiff in the library even after Plaintiff had moved, uttering to other classmates that "[he] know[s] what she wants" when asking to go on a date with Plaintiff, and stalking Plaintiff in the library even after classes had ended for the trimester. **SOF 256-274**.
[12] In a few instances of many, Male Student had "hovered" around Plaintiff (who was quickly moving around) and threateningly stared at her at a Logan club event,  glared at Plaintiff as her classmate was touching Plaintiff's upper thigh to measure it for a Kinesiology class, and continually stalked Plaintiff in the library. **SOF 275-277**, **278-279**, **280**.

**31**, **281**.  To this, Sawalich responded that she had met with Male Student twice, earlier that month, despite that Plaintiff specifically requested - in fear of retaliation - that Sawalich would alert her of any meeting with Male Student. **SOF 32, 282, 253**. Sawalich expressed to Plaintiff that she had *two* meetings with Male Student because he was "really angry at the first [meeting]." **SOF 33**.  She also indicated that Male Student expressed that he "knew" who had reported him and Sawalich indicated that she told Male Suspect that any form of retaliation on his part would be "frowned upon." **SOF 34**, **284**.[13]

Plaintiff asked Sawalich if she had interviewed any of her witnesses, to which Sawalich responded that she had not done so and the *only* "investigative" steps she had taken was to interview Male Student and reveal that a complaint was made against him.  **SOF 35, 288-290**. With this, Sawalich considered the investigation "complete" on January 19, 2016 "Because of [Plaintiff's] wishes to remain anonymous" at the time. **SOF 44**.[14]   Sawalich affirmed that she could not take any further action and that Plaintiff had to "deal with" the situation; Plaintiff began looking at other schools. **SOF 302-315**.   Meanwhile, Male Student's stalking and harassment did not stop.[15]

Frustrated with how the "investigation" was being conducted, Plaintiff attended a meeting with Boyd Bradshaw,[16] who had been referred to Plaintiff by Stacy Till (Till had previously asserted that Sawalich's actions were "not okay"), on February 1 to complain about

---

[13] However, Male Student did surrender that he could "understand" how his actions may be considered harassment or stalking. **SOF 287**.

[14] In Sawalich's opinion, though Plaintiff strongly disagreed, it would be "too difficult" and not "feasibl[e]" to interview witnesses under those circumstances.  **SOF 291-294**.  Nevertheless, Plaintiff implored that Sawalich should talk to at least *one* of her witnesses, as she was now even *more* afraid in that Male Student seemingly knew who had reported him and that she now had essentially no protection. **SOF 295-301**.

[15]  Meanwhile, Male Student continued to stalk and sexually harass Plaintiff, making her so uncomfortable that another student confided that she would "call the cops" if this student were ever in a room alone with Male Student and that this student too had received Male Student's unwelcome invitations to bring alcohol to the other student's house and walk her to her car. **SOF 306-314**.

[16] Bradshaw supervised and had frequent one-on-one meetings with Sawalich. **SOF 85-87**, **142**.

how Sawalich was handling the investigation.[17] **SOF 40-41**, **88**.  In this meeting, Bradshaw informed Plaintiff that her investigation would be reopened.  **SOF 43**. Moreover, Bradshaw reacted with shock at Sawalich's unprofessionalism,[18] advised that he would "watch over" Sawalich in further investigating, promised that action would be taken,[19] but still did indicate to "trust Shelley." **SOF 39, 46, 47, 331-333, 336**. This did not alleviate Plaintiff's concerns and other classmates continued to note Plaintiff's distress.  **SOF 100-103**.[20]

Though Logan had reopened the investigation, this was done nearly two months after Plaintiff made her initial complaint in December 2015.  In fact, Sawalich did not interview three of Plaintiff's witnesses (Daniel Trout, and Ellen Dickman, and Lucas Van Pelt) until February 3, February 4, and March 7, respectively.  **SOF 25**.  Another one of Plaintiff's witnesses, Chrissy Reed, was not interviewed at all.  **SOF 26**.  To the extent that witnesses were interviewed, interviews were conducted ineffectively and with bias.  **SOF 75-6, 57-59, 130, 347**.[21] Multiple witnesses later reported to Plaintiff that, after viewing copies of the witness statements, the

---

[17] Plaintiff met with Bradshaw in addition to previously telling other Logan employees about her concerns with the investigation's lack of action.  **SOF 49**. For instance, Professor Laurie Hart began to inquire about the circumstances between Plaintiff and Male Student, to which Plaintiff espoused that his behavior had only gotten worse, that she was in constant fear, and that Logan had taken essentially no steps to protect her. **SOF 327-328**.

[18] In fact, Bradshaw reacted to Planitiff's account with shock, exclaiming "she said that?" and expressing disdain about the situation. **SOF 329**.

[19] However, when asked about a timeline, Sawalich expressed that she had no timeline in mind and that she did not feel it was "necessary" to warn campus security of the situation. **SOF 341-342**.

[20] In fact, classmate Pam Waske noted that Plaintiff was "someone who was distressed [...] distracted by what was going on outside of class [including Male Student's behavior and the administration's lack of action]". **SOF 100**. Furthermore, Waske contended that there "were several times" when Plaintiff was "visibly upset [...] based on a conversation she had with the administration," including Sawalich, who "really upset [Plaintiff]." **SOF 101, 103**. Waske herself expressed that it was clear "[Logan's administration] didn't really do anything" about the situation. **SOF 102**.

[21] For instance, no tape recorders were ever used so that witnesses could verify their testimony for accuracy. **SOF 347**. Witness Mei Ling Robin warned Plaintiff that Sawalich was attempting to "flip" Robin's testimony. **SOF 57**. Witness Kirsten Kirkpatrick also informed Plaintiff that Sawalich was not taking the investigation seriously and that Plaintiff was "screwed," insisting that Sawalich "made it seem like [Male Student] was innocent [and] trying to flip it as if [Plaintiff] was making a bigger deal out of the situation than it was. **SOF 58-59**. Witness Theresa Zemcuznikov was not even shown the notes taken at her interview, making Zemcuznikov unable to corroborate what she had said. **SOF 130**. Ellen Dickman, library staff at Logan, similarly informed Plaintiff that, during Dickman's interview with Sawalich, Sawalich seemed to only care about Male Student "maintain[ing] library access." **SOF 75**. In fact, Dickman attempted to contact O'Reilly about the comments made by Sawalich but O'Reilly never responded. **SOF 76**.

statements were highly inaccurate and sometimes even blatantly false. **SOF 348**. However, even in the questionably-effective interviews, testimony included many heart-wrenching details.[22] On February 5, 2016, Sawalich e-mailed Plaintiff, informing her that all witnesses had been interviewed and that she planned to again interview Male Student.[23] In response, Plaintiff responded that Male Student had begun spreading rumors that Plaintiff was over dramatic and that Plaintiff saw this as a clear act of retaliation. **SOF 350-1**.  For several weeks thereafter, Plaintiff still would "run into" Male Student, as his stalking was as active and prevalent as over - except for inside the library. **SOF 353-354, 356**.

Sawalich requested to meet with Plaintiff and Plaintiff met again with Sawalich and Bradshaw on February 26, 2016, though Sawalich again acted with unprofessionalism, seemingly did not understand Plaintiff's account despite having already interviewed Male Student, and repeatedly asked if Plaintiff specifically told Male Student "no." **SOF 358-375**.[24] On February 29, 2016, continuing to endure harassment, Plaintiff had to e-mail Sawalich to ask whether or not she could volunteer at a campus Easter event because she was fearing that Male Student would be present. **SOF 56**.

---

[22]Such details included, but are not limited to, the following:
  "Interactions with [Male Student] made [Mei Ling Robin] stay away from him.  He was asking to get drinks and to come over." **SOF 155**.  "[Male Student] would always follow her or one of the girls in class." **SOF 156**. "[Male Student] had taken it further with [Plaintiff] - trying to get girls to go out with him" and doing so in a way that is "very pushy," "always around," "creepy," and "like a stalker watching." **SOF 157**. "[I]f [Male Student] comes around, [Robin] would leave." **SOF 158**. "[Male Student] would pop up and talk to [Robin] and won't leave [Robin] alone. [Robin has] seen him around school and doesn't want to be in any general vicinity or potential of having other classes with him." **SOF 159**. "Within the first week [Male Student had] gone up to every girl and tried to get them to go out and would not stop even when they said no [...] he makes all of the girls uncomfortable and they don't like it. [...] they don't want it and that they can flat out say no and he won't stop." **SOF 160**.

[23] However, Sawalich failed to note that Male Student *already knew* Plaintiff *in particular* had reported him. **SOF 349**.

[24] During this meeting, Sawalich told Plaintiff that she wanted to ensure she had Plaintiff's story "straight," periodically taking notes and asking questions.  **SOF 362-365**. Sawalich then asked if Plaintiff pointedly told Male Student "no" or that his "conduct was unwelcome;" Plaintiff could not remember the specific words used but noted that she *had*, multiple times, told him not to talk to her, avoided him as best as she could, told him to "stay away" and to "leave her alone." **SOF 366-371**.  Plaintiff also relayed another instance of retaliation: Male Student had flunked a test and was now blaming Plaintiff for placing him under stress due to her accusations. **SOF 372**; Sawalich steered the conversation away from this and instead again focused on whether or not Plaintiff had specifically told Male Student "no." In closing the meeting, Sawalich said Plaintiff could expect a report within the next week or so. **SOF 373-375**.

Sawalich issued her Official Report on March 3, 2016, though it was finished and dated February 22, 2016 - *before* Sawalich attempted to get Plaintiff's story "straight." **SOF 362-5, 376-8, 386**.  More importantly the Official Report was deficient: it contained essentially none of the detailed history of her case, did not mention her sexual assault, contained numerous contradictions, and was riddled with errors in witness statements.  **SOF 379-388**.  This caused great emotional turmoil to Plaintiff,[25] and this was perpetuated by the fact that Plaintiff was given just **three** calendar days to write her response to the Official Report. **SOF 389-90**.  The next day, Plaintiff received an e-mail regarding the impending hearing, including that she had to confront the allegations made against *her* and the possible disciplinary actions that may be initiated against *her*. **SOF 391-396**.  Plaintiff again voiced her concerns with Boyd Bradshaw. **SOF 397-411**.

Sawalich, e-mailing only Gene Spilker, Erika Hackett, Robert Kuhn, Nichole Nichols, Lori Fulford, and Haydee Manoni, pulled together a Student Honor Council. **SOF 161**.  Plaintiff, with her mother, met with the Student Honor Council of March 8, 2016. **SOF 64, 412-13**.[26] However, the Council meeting was nevertheless uncomfortable an ineffective.[27] For instance, one Council member directly indicated that she "had not seen" the first e-mail pasted to Plaintiff's response to Sawalich's Official Report; the Council member was provided this information. **SOF 428**.  In another instance, a council member said that Plaintiff will look back

---

[25] When Plaintiff received Sawalich's Official Report, she was crying and had to be comforted by classmate Pam Waske. **SOF 60**.  In fact, Sawalich's Official Report made Plaintiff even *more* fearful of Male Student. **SOF 63**.

[26] The Council was made up of five members, none of whom identified themselves to Plaintiff. **SOF 82**. The Council decided to meet with Plaintiff first because, according to a Council member, "it all started with [Plaintiff]." **SOF 65**. During the Council meeting, Lori Fulford promised to keep the Male Student away from Plaintiff. **SOF 66**.  Another member told Plaintiff that they were "going to protect [her]" because they wanted her to "feel safe;" they would "separate" Male Student from Plaintiff or "suspend him [...] whatever it takes." **SOF 120**.

[27] Plaintiff's mother was not allowed to testify, the Council had not seen material presented by Pearson that the Council was supposed to have previously analyzed, the Council interrupted Plaintiff while she was speaking, and even made offensive comments to Plaintiff. **SOF 116-119**, **121**.   At no time did the Honor Council express any procedure and/or method for determining whether Ms. Pearson's complaints were founded. **SOF 430**.

at this at thirty "and laugh," and continually commented that Plaintiff's age and sex was clearly linked to Plaintiff's feelings. **SOF 121, 423-26**.  In addition, the most senior member on the Student Honor Council was Robert Kuhn, professor at Logan University, who had formerly been investigated by Logan in response to allegations made by students of Kuhn's lewd comments.[28] **SOF 136, 133**.

The outcome of Plaintiff's investigation would decide if Plaintiff stayed at Logan University. **SOF 51**.  However, Plaintiff never even received the entire Council decision. **SOF 67**. On March 11, 2016, Sawalich reported that the Council found Male Student "not responsible" for either harassment or stalking and stated that Male Student could use the Logan facilities "without limitations" though there is to be no personal contact. **SOF 431-36**.  Plaintiff soon thereafter around March 15, 2016, requested an appeal, and Kimberly O'Reilly stated that such would take approximately a week. **SOF 448-49**. Approximately one week after this, Plaintiff had a panic attack in the library due to feeling unsafe. **SOF 455**.  Plaintiff requested of O'Reilly's assistant an urgent meeting with O'Reilly, who never returned to her office. **SOF 456-460**. On March 31, 2016, O'Reilly informed Plaintiff that she was staying the decision for six more weeks.  **SOF 461**.  On April 4, 2016, O'Reilly sent an e-mail stating that conducted a "thorough review" and found no reason to overturn the Honor Council's decision. **SOF 474-477**.

### *Facts Relating to Kirsten Elizabeth Kirkpatrick*

Male Student also stalked and harassed Plaintiff Kirkpatrick, including sending her threatening text messages and following her to her car. This caused Plaintiff Kirkpatrick severe emotional distress; in fact, one night she woke out of bed because she thought she saw him "out the window." As such, Kirkpatrick did not feel safe at Logan University. **SOF 89 - 94**, **490-502**. Plaintiff Kirkpatrick, in an interview for Plaintiff Pearson's investigation, complained to

---

[28] Classmate Alyssa Trounter also indicated that Kuhn "made inappropriate comments that made her and her classmates feel uncomfortable." **SOF 105**.

Sawalich about Male Student on February 4, 2016 and hoped that Logan could handle the situation. **SOF 50**, **503**, **507**. Instead, Logan misrepresented her testimony. **SOF 509-514**. Logan did not investigation Plaintiff Kirkpatrick claims at all. **SOF 515**. As a result, Plaintiff Kirkpatrick withdrew from Logan. **SOF 516-517**.

## ARGUMENT

From a negligence standpoint,[29] during the timeframe of this lawsuit, Logan had a duty to take reasonable protective measures to protect Plaintiffs and other similarly-situated students from the risk of sexual abuse and/or sexual assault and/or sex-related stalking. A duty will arise when a college or university has prior notice of a substantial risk of peer harassment in the college or university's programs "*based on evidence such as previous similar incidents of assault.*" *See, e.g., K.T. v. Culver-Stockton Coll.,* 865 F.3d 1054, 1058–59 (8th Cir. 2017)(emphasis added), citing *see Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290 (1998)(It is not required that previous incidents of sex-related misconduct necessarily occur by the specific perpetrator). Although in a slightly different context, *Simpson v. Univ. of Colorado Boulder,* 500 F.3d 1170 (10th Cir. 2007) is instructive in illustrating how a multitude of factors can show an environment is so permissive and inadequate-in-addressing sexual misconduct, that conduct such as that suffered by Plaintiffs is reasonably foreseeable.[30]

---

[29] To make out a claim for negligence, a plaintiff must establish that "(1) a defendant had a duty to protect the plaintiff from injury, (2) the defendant failed to perform that duty, and (3) the defendant's failure proximately caused injury to the plaintiff." *Lopez v. Three Rivers Elec. Co-op., Inc.,* 26 S.W.3d 151, 155 (Mo. 2000).

[30] *Simpson* involved two plaintiffs who were sexually assaulted at a party attended by university football players and recruits at the University of Colorado, Boulder. *Id.* at 1171. In providing context to its analysis, the *Simpson* court noted that "a funding recipient can be said to have 'intentionally acted in clear violation of Title IX,' when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient. *Id.* at 1181. The *Simpson* court further pointed out that implementation of an official policy can certainly be a circumstance in which the recipient exercises significant "control over the harasser and the environment in which the harassment occurs." *Id.* at 1178. While applicable to the determination of the plaintiffs' Title IX claim, the Court's subsequent analysis also illuminates how a duty of care on the part of a university may arise from factors other than simply "prior similar acts" by a specific individual. In reviewing the evidence, the *Simpson* court found that summary judgment was inappropriate because the facts showed that a high-level administrator (the head football coach), due to being aware of larger issues such as media coverage of an improper attitude towards women at the University and by the football team, as well as being aware of specific incidents of misconduct: 1. "had general knowledge of the serious risk of sexual harassment and assault" in the specific threatening environment; 2. "knew that such assaults had indeed occurred within" that environment; 3. despite such knowledge, allowed the same factors making the environment dangerous to persist; and 4. "both

This case is analogous to *Simpson*.  Just as was true in *Simpson,* here there is a backdrop consisting of multiple factors making Logan aware that its on-campus environment and attitude of its administration was such that, without significant correction, its young, female students would be susceptible to sexual misconduct by predatory males.

**FIRST**, in the years leading up to a during Plaintiffs' enrollment at Logan, there was a recent history of sexually-based offenses being committed by one student upon another; and Logan was fully aware of those offenses including the three Title IX complaints Sawalich directly was involved with, the cover-up confirmed by Dr. Hartmann, and the Brandi Kostal matter investigated by the OCR.  **SOF 151, 480.** More particularly, Logan also was aware of a particularly disturbing phenomenon reported by Dr. Kimberly Hartmann, a former head of Logan's Alumni Association who had worked on-campus with Logan's other administrators on a daily basis during the years immediately preceding Plaintiffs' enrollment. **SOF 98, 99**.   Dr. Hartmann reported that James Paine, Logan's former Dean of Students immediately preceding Dean Sawalich, one day admitted to her that multiple female students had come to him and complained of being sexually harassed by a member of Logan's own Board of Trustees. **SOF 142, 151**.[31] Dr. Hartmann recalls the following events around 2012-2013:

> "He [James Paine] had -- and I remember this conversation distinctly because it was just stunning, like shocking what he was telling me.  He had said that he one or more girls that had come to him and complained about sexual harassment things in nature.  But it related to a board member.  And so he [James Paine] would ask the girls to go upstairs and speak with Doctor George Goodman [former president of Logan University who is now deceased].   And apparently [Goodman's] wife who also worked at the college at the time had intervened and told [...] more than one [...] gir[l] that if they went any further with the matter they would have -- she would have them expelled [...] I guess I was stunned.  I was shocked at what he was telling me [...] Mrs.

because of incidents reported to him and because of his own unsupportive attitude, knew *that there had been no change in atmosphere"* since the time of the previously-reported incidents. *Id.* at 1184-85.  Because of those facts, the *Simpson* court concluded, "a jury could infer that 'the need for more or different training [of player-hosts was] so obvious, and the inadequacy so likely to result in [Title IX violations], that [the coach] reasonably be said to have been deliberately indifferent to the need." *Id.,* citing *City of Canton v. Harris,* 489 U.S. 378 (1989).

[31] The testimony of Dr. Hartmann's as to what she was told by James Paine may be admitted into evidence to prove the truth of the underlying circumstances; the statements made by James Paine are excepted from hearsay by constituting admissions against interest by a party-witness, as James Paine was a Logan employee at the time he made such statements.

> Doctor Goodman would intervene.  Tell them that if they were to speak to anybody about the incident, she would have them expelled and they would not be able to basically apply or get into any other chiropractic college." She further clarifies that she did not further report this because "Doctor Goodman was [...] very forceful [...] It wouldn't have ended well." **SOF 151**.

When questioned about these matters, Dr. Paine himself did not deny the circumstances.  Rather, quite unbelievably, he claimed simply to "not remember" the circumstances.  Notably, Dr. Paine also "did not remember" the conversation with Dr. Hartmann. **SOF 152(a)**. He could not recall "anybody bringing sexual harassment complaints to [him]." **SOF 152(b)**. He could not recall the conversation with Dr. Goodman or his wife. **SOF 152(c)**. He could not recall telling any students to see Dr. Goodman. **SOF 152(d)**. He could not recall any complaints about a Logan board member. **SOF 152(e)**. He could not recall the number of Title IX investigations he handled or whether or not he even did handle Title IX investigations. **SOF 152(f)**. He could not recall his own performance improvement plan. **SOF 152(g)**. He could not recall any significant detail about the Title IX complaint handled by the Office of Civil Rights, or any policy changes stemming from Brandi Kostal's complaint. **SOF 152(h)**.  James Paine instead stated that there "aren't a lot of things about my time at Logan that I recall".  **SOF 152(i)**.

    **SECOND**, both reports were made to Dean Sawalich that the Male Suspect, specifically, had sexually harassed and/or stalked not just Plaintiffs, but other female students on campus. **SOF 155-160**, **176**. In fact, Dean Sawalich's notes of her interview with another student, Mei Ling Robin, even indicate that Male Suspect's "interactions [with Mei Lin Robin] made [Robin] stay away from him" because "He was asking to get drinks and to come over, but she said no." **SOF 154**.  She further noted that "her frustration [was] growing" because Male Suspect would "pop up [to] talk to her," and would not "leave her alone." **SOF 159**. Robin additionally reported that "[Male Suspect] would always follow her or one of the girls in class."  **SOF 155**. In fact, Robin reported a noteworthy interaction with Chrissy Reed and stated that, "within the first

week, [Male Suspect] had gone up to every girl and tried to get them to go out and would stop even whey said no." Because of this, "[Male Suspect] makes all the girls uncomfortable [...] they don't want it and they can flat out say no and he won't stop." **SOF 160**. In addition, Ms. Kirkpatrick communicated to Sawalich that she was extremely uncomfortable with Male Student and confirmed his threatening behavior. **SOF 496-507** The fact that at least *three* students reported sex-based improper conduct by just *one* student also supports the reasonable inference that *many other students* had similarly been reporting similar acts to Logan's administration both in the years preceding Plaintiffs' enrollment, as well as during Plaintiffs' time there.  In fact, both Plaintiffs will testify that they had heard from other students that numerous sex-based claims were communicated to Logan administration, yet were largely ignored. **SOF 168-175**.

**THIRD**, in addition to the fact Logan was well-aware of multiple sex-based transgressions being committed against its female students, Logan also was aware of inappropriate sexually-discriminatory actions committed by its administrators in a variety of contexts.  For instance, in 2013, Logan was found to have discriminated against a pregnant student by giving her failing grades rather than "incomplete" grades.  As a response, the U.S. Department of Education Office of Civil Rights filed a 2013 Administrative Complaint, including allegations that the Complainant was aware of at least two other similarly-situated students at the time that had receiving similar discriminatory treatment, as well as another student that was undergoing such treatment at that time. SAC (Doc. 52), at 6 (with cited exhibit).

**FOURTH**, adding to the unmistakable signals to Logan that its female students were susceptible to sex-based misconduct, a Logan senior faculty member was reported to the administration as having made disgusting, sexually-charged comments directed particularly at young, female students. At least two separate students testified the same. **SOF 105**, **133.** Current student, Kristi Church, delineated the following:

He had made a very rude and somewhat lewd comment to the class as a whole. And apparently  somebody had gone up to the third floor about it and I  guess turned him in for it, and they wanted other's opinion that was in the classroom at the time and so I provided that [...] And he just made the comment of you guys are Try Ones and it's your first time, you'll be -- your papers are cherry red because it's your first time. It will be real easy to find your spots so [...] he didn't really need to [expand upon the comment]. **Everyone was kind of taken aback at that point in time [...] He was referencing popping cherry from because it's our virgin time taking finals. That was his reference. That's what everyone thought. That's what I thought at the time. And it was just uncalled for and gross [...] Everybody was pretty disgusted**. There were a few people who had left and a few people who were -- I was pretty disgusted by it. I mean, it's inappropriate to say something like that. I'm an older student but there are students in there who are 20, 21, you know,  it's not appropriate [...] everybody was well aware of what he was implying. **SOF 133**. (emphasis added).

As noted above, unbelievable and inexplicably, of *all* the potential students, faculty, and staff members at Logan that could have served on its "Student Honor Council," Dr. Kuhn was chosen *by the Title IX coordinator* to sit on Ms. Pearson's; in fact, Shelley Sawalich e-mailed only *six* faculty/staff members in assembling the Honor Council, of which one was Dr. Kuhn. **SOF 136, 161**.

**FIFTH**, in addition to all of the factors specifically enumerated *supra*, multiple statutes and collections of guidance documents issued by the United States Office of Civil Rights provide a source of knowledge from which Logan should have been able to discern its duty to take reasonable protective measures to protect Plaintiffs and other similarly-situated students from the risk of sexual abuse and/or sexual assault and/or sex-related stalking. *See,* SAC (Doc. 52), 8-17.

The above-listed factors, especially collectively, along with the reasonable inferences that can be derived therefrom, created a duty on Logan's part to take reasonable protective measures to protect Plaintiffs and other similarly-situated students from the risk of sexual abuse and/or sexual assault, satisfying the first requirement of a negligence cause of action, as well as the first two elements of Plaintiffs' premises liability cause of action.[32]

---

[32] Plaintiffs' claim of premises liability is based on a theory of negligence, a plaintiff first must show that (1) a dangerous condition existed on the defendant's premises which involved an unreasonable risk; and (2) the defendant knew or by using ordinary care should have known of the condition. *Marmaduke v. CBL & Assocs. Mgmt., Inc.,* 521 S.W.3d 257 (Mo. App. 2017). Similar to the sort of factors establishing a duty of care in a general negligence claim, this very Court in *Woodbury v. Courtyard*

16

Once a defendant's knowledge of a dangerous condition and duty of care is established, for a negligence claim, it must be shown that a defendant failed to perform the duty, whereas for a premises liability claim, a plaintiff must establish the defendant failed to use ordinary care to remove or warn of the danger. Multiple factors establish that Logan breached its duty, failed to exercise reasonable care to address dangerous circumstances, and was otherwise "deliberately indifferent" to Plaintiffs' safety in violation of Title IX:

**FIRST**, Logan's Title IX board was completely inadequately composed, ill-trained and unprepared. For example, Robert Kuhn admitted that he never had to "undergo any training specific to being on the Student Honor Council," that there were no qualifications for a Student Honor Council member, that positions on the Student Honor Council were not "appointed" but rather given to volunteer, and that members were not advised of any previous precedent for how Honor Council members should make a decision. **SOF 138-141**. With no training, guidelines to follow, or basic idea of the process, Logan's ability to adjudicate was thereby compromised. Moreover, despite Sawalich asserting the day before that she would provide the Council with Ms. Pearson's Response, the Council members indicated that they must have cursorily reviewed, if they reviewed at all, her Response; one female Council member even directly stated that she "had not seen it" in response to Ms. Pearson's reference to an e-mail pasted on the very first page of her Response.  **SOF 428**.

**SECOND**, Logan's Student Honor Council did not even *know* the correct standard of review, let alone *apply* the correct standard of review. **SOF 137**. The Student Honor Council was required to apply the preponderance of the evidence standard. **SOF 134**.  However, Robert Kuhn,

---

*Management Corp.,* 2013 WL 4401822, *4-5 (E.D. Mo. 2013)("*Woodbury*") this Court described the sort of evidence (*a fortiori* meeting the punitive damages standard) that could establish a defendant "consciously disregarded the probability of injury," and primary amongst the items of evidence the Court pointed to was the fact there had been "prior" similar incidents resulting in injuries to people other than the plaintiff. *Id.* That evidence, *inter alia*, made it so that "a reasonable juror could conclude that the [defendants] were not only aware of a risk of injury ... but consciously disregarded that risk." *Id.*  Thus, the above-listed factors, collectively, establish not only that a hostile, sexually-discriminatory environment existed on Logan's campus, but that Logan certainly knew of the condition and, for the reasons set forth below, consciously disregarded that risk. *See id.*

a professor at Logan University who sat on the Honor Council that decided Plaintiff's case, nevertheless contends the following:

"This is a process, as I understand it, that we're just trying to determine the truth. We've got two sides of a story and we have some witnesses [...] we're not a legal body. **We don't have to do preponderance of the evidence or any of those other legal things that you guys in this room know. We're just trying to figure it out, get to the  truth." SOF 136, 137**. (emphasis added).

Notably, Logan, in citing the *Dear Colleague* Letter provides that a "**Complainant's word alone [is] sufficient to sustain burden of proof - preponderance of the evidence**" because "**A single instance of sexual harassment is sufficiently severe to create a hostile environment**." **SOF 135**.   To the extent that the Student Honor Council knew the correct standard, which it did not, it is abundantly obvious that the complaints of Plaintiff Pearson - as well as her numerous classmates - far surpasses the preponderance of evidence standard. Logan thereby exposes the lack of reasonable care involved in the Honor Council's increasingly important decision of imposing actual remedial action: despite having a clear standard to follow, the Student Honor Council, by Sawalich's deliberate indifference and failure to alert members of the process, had no such idea of a certain standard.

**THIRD**, as to the danger posed by the Logan Board of Trustees member, the "solution" was extremely disturbing and problematic, including the "cover-up" that Dr. Hartmann testified to as noted *supra*.

**FOURTH**, in addition to the Logan "Student Honor Council" being procedurally inadequate, for an unknown period of time, but at least during Ms. Pearson's tenure, the Logan professor, Robert Kuhn, accused of making sexually-discriminatory remarks was the most-senior member of the board. His bias, as additionally noted *supra*, even showed as he stated to Plaintiff

Pearson: "[you] don't know how you would feel [in regards to the Male Student's conduct] when you are thirty; you might even laugh."  **SOF 425**.

**FIFTH**, Logan established a pattern and practice of ignoring current students' complaints.  To take some examples of presumably many more, Plaintiff Kirkpatrick and Mei Ling Robin made substantial complaints against Male Suspect's conduct and Logan essentially took no action.[33]

**SIXTH**, and most directly applicable to the Male Suspect, Logan did not adequately implement the requirement to educate its students. This was glaringly obvious in the case of the "campus SaVE act" requirement. In an e-mail sent to Suspect on January 19, 2016, 42 days after Plaintiff made her initial complaint, Sawalich writes that Suspect "only scored 5/8" on the Campus Sexual Violence Elimination ACT of 2013 (the "SaVE" Act) quiz despite that each student "must score 7/8 for completion." **SOF 165**.  Sawalich, however, contends that Logan provided this quiz for sexual misconduct training, of which there is "no consequence" if a student chooses not to take, or fails, the quiz, desp*ite a university having to provide sexual misconduct training as a "requirement under Title IX" and Logan providing the SaVE Act quiz as "fulfill[ing] that requirement."* **SOF 486** (emphasis added).  In other words, despite Suspect having not met the University's basic knowledge requirement of the very regulations surrounding the very acts he was instigating, Defendant took essentially no action other than a belated reminder e-mail.  This is all despite Sawalich touting that she was at that moment conducting an "investigation" of Plaintiff's claims against Suspect.

---

[33] As emphasized *supra*, Mei Ling Robin also serious complaints, including that her interactions with him "made [her] stay away from him," "He was asking to get drinks and to come over, but she said no." that "her frustration [was] growing" because Male Suspect would "pop up [to] talk to her," and would not "leave her alone," that "[Male Suspect] would always follow her or one of the girls in class," that "within the first week, [Male Suspect] had gone up to every girl and tried to get them to go out and would stop even when said no," and that girls "can flat out say no and he won't stop." **SOF 154-160**. Kirkpatrick made a similarly concerning complaint regarding Male Student. **SOF 50**.

**SEVENTH**, Logan's security was completely inadequate, as only one security guard patrols Logan's campus at one time  and it would take a security guard "ten minutes" to walk across Logan University's campus in the case of an emergency. **SOF 126-127**.

**EIGHTH**, Logan committed nearly countless procedural violations and errors in addressing Ms. Pearson's Title IX complaint, as set forth in greater detail *infra*.

The above-delineated factors, multiple and various failures by Logan, by themselves, but *especially* collectively, establish Logan breached its duty of care, and establish that Logan failed to take corrective measures to cure the dangerous environment exposing its female students to harm by sexual predators. Moreover, these factors, along with those mentioned in greater detail below, establish Plaintiffs' Title IX claims.

## TITLE IX

Despite Logan's attempt to characterize the actions of the Male Student as essentially "no big deal," the Male Student's behavior was in fact so severe and pervasive that *both* Ms. Pearson and Ms. Kirkpatrick decided to completely withdraw from Logan because of being exposed to such conduct without any protection. All of the elements of Plaintiffs' Title IX claims are sufficiently established.[34]   Here, Defendant's actions and inactions, at the very least, clearly made Plaintiffs, especially Ms. Pearson, increasingly vulnerable to Suspect's harassment and, much more likely, caused the harassment.  From a procedural standpoint, the investigation into Ms. Pearson's complaint was deficient in numerous particulars:

**FIRST,** Logan failed to timely commence its Title IX investigation into Ms. Pearson's claims. Plaintiff initially rendered a complaint to Sandra Perriello, Associate Dean of Logan, on

---

[34] Title IX asserts that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Court further provides, "A defendant university will only be held liable for such actions where it acted with (1) deliberate indifference (2) to a known act of discrimination (3) which occurred under its control." *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003)(citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 534 U.S. 274, 290-291 (1998).  In *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 653 (1999), the United States Supreme Court asserted that the sort of conduct giving rise to a Title IX violation must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.

December 8, 2015 and another complaint to Shelley Sawalich the following day on December 9, 2015.  **SOF 7, 4**. Yet, instead of immediately beginning her investigation, Sawalich required Ms. Pearson - the victim of Male Suspect's sexual assault - to provide a written statement before she would even *begin* interviewing Male Suspect and witnesses, placing the burden to supply the statement upon Ms. Pearson the week directly before her final exams at Logan University, when Plaintiff's time already was heavily constrained and she was under significant stress.  **SOF 8**, **9**, **14**, **27**, **28**, **30**. In refusing to commence an investigation without such a statement, Sawalich violated not only Title IX, but Logan's own policies. *See, e.g., Morlock v. West Cent. Educ. Dist*. 46 F. Supp. 2d 892, citing *Doe v. University of Illinois*, 138 F.3d 653, 661–62 (7th Cir.1998))(Title IX   requires "prompt, appropriate action in response to student-on-student sexual harassment").  In a presentation given to Logan University employees entitled *What You Need to Know About Title IX*, Shelley Sawalich herself pointed out:

> "**Once a school has notice of possible sexual harassment** of students [...] **it should take immediate and appropriate steps to investigate** or [...] end any harassment, eliminate a hostile environment [...] and prevent harassment from occuring again.  **These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action**." **SOF 162(a)**. (emphasis in original).  ...
> The "Institution should 'own' the investigation [...] Parties should not be *required* to write their own statements." **SOF 162(b)**.  Logan University's "Procedures for Campus Disciplinary Action" further explains, "The Investigator [in this case, Shelley Sawalich] will commence an investigation *within seven business days of notification*." **SOF 163**. (emphasis added).

Because Dean Sawalich completely disregarded her own presentation of Title IX's requirements, Sawalich did not meet with the Male Suspect - or take any other action to investigate Ms. Pearson's complaint - until January 8, 2016, an entire *month* after Plaintiff's initial complaint was made. **SOF 164, 7**.  Although Defendant implies in its summary judgment motion that the delay due to a winter break were students were "not on campus" (Dkt. 59, at 4), that excuse rings hollow as, at least two times during Sawalich's "investigation" in February

2016, Sawalich *called* students in order to interview them, showing that a student's absence from campus has not barred Sawalich in other situations. **SOF 149, 150**. Sawalich's intention becomes even clearer as her supervisor, Boyd Bradshaw, also does not understand Title IX requirements. **SOF 86**. When prompted, it was Boyd Bradshaw's understanding that "a student *must provide a written complaint* for a Title IX investigation to begin [...] *as opposed to a verbal complaint*." **SOF 128**, emphasis added.  This is despite Sawalich herself noting - though not following - that "Parties should not be *required* to write their own statements." **SOF 162(b)**;

 **SECOND**, despite Ms. Kirkpatrick complaining of actionable sexual discrimination, Logan did not investigate her claim *at all.*  Ms. Kirkpatrick absolutely complained of actionable sexual harassment. **SOF 50**, **58**, **59**, **89**, **90**, **91**, **92**, **93**, **94**, **95**;

 **THIRD**, Logan inappropriately *completely abandoned* the Title IX investigation, blaming Ms. Pearson's desire to remain anonymous, until Ms. Pearson herself insisted that the investigation recommence.  One of the most inappropriate steps that Sawalich took in these circumstances was completely abandoning the investigation, marking it as "complete" on January 19, 2016 "Because of [Plaintiff Pearson's] wishes to remain anonymous." **SOF 44**. She did not recommence until February 2016, **SOF 43**.

 **FOURTH**, Logan failed to timely conclude Ms. Pearson's investigation, issuing a decision on March 11, 2016, over *90 days* from the December 9, 2101 report. **SOF 431**;

 **FIFTH**, the consequences to Ms. Pearson of Logan's failure to timely commence and timely conclude the investigation were severe. This lack of action and failure to remedy the situation all spawned further harassment perpetrated against Plaintiff. This includes, but is not limited to, the events and deleterious effects that establish a pattern of practice of Suspect's stalking and sexual harassment, as noted *supra*. In other words, it is clear that, by Defendant's failure to act, Defendant made Plaintiff vulnerable and liable to harassment;

**SIXTH**, as also noted *supra*, the matter was not reviewed by Logan's "Student Honor Council" pursuant to the correct standard of review. **SOF 137**;

**SEVENTH**, The "Student Honor Council" itself had at least one member who themselves had made sexually-discriminatory comments to Plaintiffs. **SOF 417, 133, 425**;

**EIGHTH**, Dean Sawalich did not present the facts of her investigation in an impartial manner and tainted the "Student Honor Council's" determination by improperly injecting her own opinion and bias into her presentation of the case to the Council.   Sawalich herself contends that the "facts of the case" were truths "held by **all** individuals," notably *including Male Student*. **SOF 487(d)**(emphasis added).   **In other words, if *Male Student* himself did not agree to a "fact," it could not be categorized as a "fact" at all**.   The Student Honor Council, assuredly, relied on these facts, which were also sometimes plainly untrue,[35] to determine the outcome of the case, thereby undermining Plaintiff and thwarting the procedural efficacy.   In addition, the "facts" of the case - nor the "Report of Investigation" - failed to include **essential** testimony that was delineated in Sawalich's handwritten notes.   Unincluded and false testimony include, *inter alia*, the following:

- The "facts in the case" include that "[Plaintiff Pearson] never told [Male Student] to generally leave her alone or that he was harassing her."   **However**, Shelley Sawalich's notes confirm that "[Plaintiff Pearson] probably him no / blew him off [...] 12-18 times maybe," yet this was not included in the "facts of the case."   **SOF 488(a)**.
- The Report of Investigation includes that "Fourteen people, aside from Morgan and Kevin were interviewed [...] 12 of the people said that they witnesses [...] nothing out of the ordinary."   **SOF 488(b)**.   **However**, as noted *supra*, at least Mei Ling Robin (**SOF 155-159**), Kirsten Kirkpatrick (**SOF 50, 503, 507**), and Theresa Zemcuznikov stated - as confirmed by Sawalich's notes - incredibly serious claims.[36]

---

[35] Included in the facts were that "[Plaintiff Pearson] never told him to generally leave her alone or that he was harassing her." **SOF 487(e).**   This is contradicted by Sawalich's notes, stating:  "[Plaintiff Pearson] probably him no / blew him off [...] 12-18 times maybe." **SOF 488(a).**

[36] In a witness interview with Theresa Zemcuznikov, Shelley Sawalich's notes state that Zemcuznikov stated: "I'd never go anywhere alone with him," that Male Student stated to Zemcuznikov, "Come on over here for a ride and I'll relieve your stress," that Plaintiff Pearson was "like a deer in the headlights," that Male Student asks Zemcuznikov "to snuggle," that Male Student is "pushy," and that Zemcuznikov "advised [Plaintiff Pearson] to stay clear of him." These details were not included in the "facts in the case."   Sawalich's notes state that Zemcuznikov corroborated that "[Male Student] is staring at [Plaintiff Pearson] in the library."   The "facts in the case" do not state this. **SOF 488(f)(g).**

- The Report of Investigation includes, "Most people interviewed *did not witness enough to substantiate claims of stalking or harassment*." **However**, this clearly shows bias by Sawalich's injection of her own judgment, (emphasis added). **SOF 488(c)**.
- The "facts in the case" does not include that Plaintiff Pearson is "afraid of retaliation." **However**, Plaintiff Pearson stated the same in her initial complaint and is noted as such. **SOF 488(d)**.

**NINTH**, Ms. Pearson's appeal of the Council's determination was grossly inadequate. **SOF 450-479**.

Each of those failings, by themselves, and especially cumulatively and in light of the backdrop of circumstances establishing Logan's "rape culture," are enough for a jury to find that Logan was "deliberately indifferent."

## DAMAGES

Finally, as to damages, Logan asserts that Plaintiffs cannot recover the same because they have not established an "intentional violation" of Title IX. Yet, as the foregoing countless facts establish, Logan's behavior absolutely did constitute an intentional violation of Title IX. Defendant not only was "deliberately indifferent" and negligent, but Defendant was, based upon the facts and circumstances herein, *grossly* negligent in purposely failing to protect Plaintiffs, and instead actively trying to cover-up their complaints.

Plaintiffs suffered a variety of damages due to Logan's intentional failure to protect them and attempt to cover up their victimization. Foremost, despite Logan's attempt to confuse them with legal terms-of-art and leading questions, both Plaintiffs will testify at trial that, due to the fear of being continually victimized due to a lack of protection by Logan, they each decided to withdraw from Logan. **SOF 516-17, 520, 540, 542-43**. In addition, both were so mentally damaged and discouraged by the circumstances, that both gave up their dreams of being chiropractors. **SOF 524, 546**. Especially as to Ms. Pearson, she made the decision for her own protection as, most likely emboldened by Logan's conduct, the Male Student had even

threatened to transfer *along with Ms. Pearson* to any other chiropractic school she tried to transfer to **SOF 554**. Because of their forced withdrawal, both Plaintiffs lost the tens of thousands of dollars they had spent on their first-year tuition at Logan, **SOF 553, 531**, as well as the loss of future income for having bachelor degrees instead of chiropractic degrees. **SOF 529, 551**. Logan's own, judicially-noticeable, public advertising illustrates that a student graduating from Logan could expect to earn $147,000 per year, much more than the $35,000 per-year a student graduating with a simple biochemistry bachelor's degree can expect to make (what both Plaintiffs have instead had to pursue), based on similarly judicially-noticeable public sources. **SOF 529**, **551**. No "expert witness" is required to calculate a chiropractor's potential future earnings when Logan itself admits to the amounts, nor is an expert required to do the simple math (multiplying the difference in salaries by number of years of work) to establish an immense loss of future income for both students, of an amount exceeding millions based on a conservative measure of 30-years of work.

In addition to lost tuition and lost potential income, both Plaintiffs suffered non-diagnosable mental damages including humiliation, fear and damage to their reputations. **SOF 556-561**, **SOF 534-538**. Finally, because the facts described herein establish Defendant was *grossly* negligent, each Plaintiff also is entitled to punitive damages.

25

Respectfully submitted,

 /s/ Daniel F. Harvath
Daniel F. Harvath, #57599MO
**Harvath Law Group, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
314-550-3717
dharvath@harvathlawgroup.com

## Certificate of Service

 I hereby certify that on July 6, 2018, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Mark E. Goodman and Andrew W. Blackwell, Attorneys for Defendant.  The exhibits attached to this document were filed under seal and a copy was sent via electronic mail to Mark Goodman and Andrew Blackwell, Attorneys for Defendant.


        /s/      Daniel F. Harvath