UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MORGAN PEARSON, et al.,              )
                                      )
            Plaintiffs,               )
                                      )
      vs.                             )        Case No. 4:16 CV 1450 CDP
                                      )
LOGAN UNIVERSITY,                     )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

Morgan Pearson and Kirsten Kirkpatrick were chiropractic students at Logan

University who allege that they were sexually harassed by a fellow student (FS).

Plaintiffs claim they reported FS's behavior to Logan, but Logan responded

inadequately to their complaints. They bring claims against Logan for gender

discrimination under 20 U.S.C. § 1681 (Title IX), as well as state law claims for

negligence and premises liability.[1]

Logan moves for summary judgment on all claims. Because the undisputed

material facts demonstrate that Logan is entitled to judgment as a matter of law on

all claims, the motion will be granted.

---

[1] I dismissed plaintiffs' Missouri Merchandising Practices Act claim by Memorandum and Order
dated February 27, 2017. [22].

Background Facts

Pearson and Kirkpatrick both started at Logan as undergraduate students during the fall of 2015. As part of orientation, all new students, including Pearson and Kirkpatrick, were provided with a link to Logan's online academic catalog. This catalog includes Logan's policy prohibiting sexual assault, domestic violence, dating violence, and stalking. It also provides information on how to report such behavior to the Title IX coordinator and explains the investigative and hearing process. Logan also shows all incoming students a video on sexual harassment and stalking.

In the fall of 2015, FS was a student at Logan and older than the plaintiffs, who were 19 and 20 at the time. Early in the semester, FS asked Pearson and Kirkpatrick for their telephone numbers, saying he wanted to start a study group. Both women gave him their cell phone numbers, even though they thought FS was "creepy." FS texted Pearson "maybe 10 times," all during the month of September. FS first asked Pearson by text if she wanted to form a study group. When she responded "no," he sent her a text asking her to grab a drink. She told him "no" and that he "sounded creepy." The next day, FS again asked Pearson by text if she "wanted to study up on some knowledge?" Pearson ignored the texts. She alleges, however, that she became frightened of FS, and that he "acted in a threatening manner" by asking her "inconsequential questions he could have

learned from other sources." Pearson also thought FS was following her because he would try to walk her to her car or her job in the campus library. Pearson alleges that FS would try to sit at her table in the library and would come into the library when she was there and stare at her. She also claims that FS stared at her during class.

On November 12, 2015, Pearson and FS, along with all the other students in the class, were gathered around a cadaver on an embalming table during a human biology lecture. Pearson alleges that FS pressed his body against her buttocks while the students were crowding around the table. She felt fearful and humiliated but did not report the incident to the instructor or the police.

FS and Kirkpatrick texted back and forth "probably 15 times" the first Friday of the semester. FS asked Kirkpatrick if she wanted to meet up on Saturday to study in the library. She told him no. When FS continued to suggest meeting up, Kirkpatrick told him she had a boyfriend and ignored the remainder of his texts. FS texted Kirkpatrick "maybe five times" after that to ask about homework assignments. Although not pleaded in her complaint, in her deposition Kirkpatrick testified that FS also walked in the same direction as her after classes. Even though they both had the same class schedule, she thought he was waiting for her or following her because he would talk to her if she was alone. Kirkpatrick talked to FS "to be polite" and never told him to stop talking to her.

Sometime in early December, Pearson thought that FS was attempting to change his class schedule to match her own. That information prompted her to talk to Sandra Periello, Logan's Associate Dean of Students, on December 8, 2015. Pearson went to Periello because she thought she was being sexually harassed by FS. Pearson told Periello that FS was coming into the library and inappropriately staring at her during classes. Pearson also claims that she told Periello that she had been sexually assaulted by FS during class on November 12, 2015 and that she was afraid of retaliation. Periello asked Pearson to put her complaint in writing so that she could pass it along to the Dean of Students and Title IX coordinator, Shelly Sawalich.

Periello conveyed Pearson's verbal complaint of harassment to Sawalich, who met with Pearson the next day. In that meeting, Pearson told Sawalich what she had already told Periello. She also told Sawalich that FS sent her text messages asking her to study. When the November 12, 2015, lab incident was brought up, Sawalich asked whether it could have been an accident. Pearson responded, "Yeah, maybe. Like it could have been." [Pearson Depo. 68-1 at 61]. Pearson never raised the lab incident again during the investigation of her claim, the subsequent honor council hearing, or her appeal of the honor council's decision. During the meeting, Pearson asked that her complaint of harassment remain anonymous. Sawalich explained that it would be difficult to investigate

without using Pearson's name and, as a result, the investigation would be limited. Sawalich asked Pearson for the names of witnesses to the harassment and to provide her a written complaint.

Because of her schedule and at her request, Pearson did not provide a written complaint until December 21, 2015. Sawalich accommodated Pearson's request for more time to provide her statement but told her the consequence was that she would be unable to investigate until the students returned from the winter break, which lasted from December 19, 2015, through January 5, 2016. Pearson's written complaint does not mention the November 12, 2015 lab incident. [61-11]. It does, however, complain of FS texting her to study, offering to study with beer "even though he knew [Pearson] was underage," walking out of class with her, trying to participate in her conversations during class, suggesting she could come to a hockey game that he wanted to attend, trying to sit at a table with her in the library, going to the library where she worked every day, looking at her in the library, taking his computer to get repaired at the same time she took her computer to get repaired, occasionally stopping to talk to her while she was in the library, going to the library even though final exams were over, and trying to enter the same program she was trying to enter. Sawalich confirmed receipt of Pearson's written complaint the same day and reiterated that her ability to investigate could be limited by Pearson's request to remain anonymous.

On the first day back from winter break, Sawalich sent FS an email asking him to meet her. On January 8, 2016, Sawalich met with FS and told him that an anonymous complaint had been made about him by another student. Sawalich told FS that he had been accused of harassing and stalking the anonymous student. FS denied harassing or stalking anyone. Sawalich did not disclose Pearson's identity and warned FS about retaliation. Sawalich met with FS again on January 12, 2016, at his request. Although FS wanted more details about the allegations made against him, Sawalich told him that she had shared all the information she could and reminded him again about the prohibition against retaliation.

On January 16, 2016, Pearson emailed Sawalich and asked for an update on the investigation. She stated that FS "continues to show up and make me uncomfortable, and I continue to feel unsafe at Logan." Pearson was uncomfortable because FS had attended a school event that she also attended, and he stared when Pearson's friend measured her hip bone "and had to grab me on my butt" in the library. Sawalich responded that same day by email, telling Pearson that she had met with FS twice and offering to meet after the long holiday weekend on January 19, 2016. Pearson met with Sawalich on January 19, 2016, and told her about her meetings with FS, including that FS denied harassing anyone. Sawalich also told Pearson that she could not interview Pearson's list of witnesses and keep Pearson's complaint anonymous, so in light of Pearson's continued to

desire to remain anonymous Sawalich did not intend to interview any additional witnesses at that time. Pearson complained that FS may have classes with her, and Sawalich responded that she could not guarantee that she would not have any classes with FS in the future.

Pearson was dissatisfied with Sawalich's investigation of her complaint, so she met with Sawalich and Boyd Bradshaw, Vice President for Enrollment Management, to complain about the investigation on February 3, 2016. At that meeting, she stated that she thought FS was following her at the school event because she saw him "too often." She also reported that FS came into the library that day and spoke to her and another student. Pearson then decided to drop her request to remain anonymous and allow Sawalich to investigate by identifying her as the complainant. Pearson provided Sawalich with the names of witnesses and they discussed how the investigation would proceed. Sawalich told Pearson that FS would be prohibited from going into the library and instructed to have no contact with her during the pendency of the investigation.

Sawalich immediately began emailing Pearson's witnesses to set up interviews. One of the witnesses was Kirkpatrick. Sawalich interviewed Kirkpatrick on February 4, 2016, as part of her investigation into Pearson's complaint. Kirkpatrick never contacted anyone at Logan or informed them that she wanted to make a Title IX complaint. During the February 4, 2016, meeting,

Kirkpatrick told Sawalich that FS had solicited her telephone number on the first day of class, stating that he was trying to set up a study group. She gave him her telephone number, even though she thought he was "creepy." She did not see him ask anyone else for a telephone number. The first Friday of classes, FS texted her asking her if she wanted to study in the library on Saturday. She responded "no," eventually telling him she had a boyfriend and then ignoring his texts. Kirkpatrick never witnessed any interaction between FS and Pearson, and Kirkpatrick never told Sawalich that FS was following her from class. Kirkpatrick never stated that she felt sexually harassed or stalked, never told Sawalich that she wanted to bring her own complaint against FS, and never asked Sawalich to start an investigation on her behalf.

Between February 3, 2016, and February 5, 2016, Sawalich interviewed nine student witnesses identified by Pearson. One of Pearson's witnesses did not respond for a request for interview because she was not interested in getting involved. Sawalich's notes of these interviews are attached as exhibits to Logan's summary judgment motion and are part of the record in this case. [61-23 through 61-31]. While most of the witnesses agreed that Pearson had complained to them about FS, very few witnesses actually saw any interactions between the two. One female student agreed that FS was "creepy" and asked all the girls out. Some witnesses noticed that Pearson seemed uncomfortable when FS was around.

Others stated that FS was socially awkward but not harmful. Still others reported that Pearson overreacted and that they disagreed with Pearson's assessment of FS. In particular, one of Pearson's witnesses contacted Sawalich after her initial interview to report that Pearson was inappropriately implying to other students that FS was a potential rapist.

Sawalich met with FS for the third time on February 8, 2016. She told him that Pearson had made the complaint against him and questioned him about her allegations. FS admitting texting Pearson and others about getting together, but he denied knowing that Pearson was underage so he did not think it was an issue when he asked her if she wanted to grab a drink. He said he remembered texting Pearson a few times but then she stopped responding, and he denied ever intentionally trying to walk out of class with her. He denied lurking or stalking Pearson in the library or staring at her, and he did not intentionally get his computer fixed when Pearson was there. FS claimed that his potential schedule change had nothing to do with Pearson. He stated that it seemed like Pearson did not like him, and so he stopped trying to interact with her after the first few weeks of school. He sometimes asked her chemistry questions. At the conclusion of the meeting, Sawalich told FS he was not allowed in the library during the investigation, to stay away from the undergraduate classrooms when he was not in class, and to have no contact with Pearson. Sawalich also asked FS for a list of

witnesses, and she interviewed those six witnesses (including three instructors) as well. Sawalich's interview notes of these witnesses are also part of the record in this case. [61-36 through 61-41]. These witnesses never saw any inappropriate interactions between Pearson and FS. Most of these witnesses agreed that FS was "awkward" but a "nice guy" and described Pearson as young and a troublemaker. One witness reported Pearson complained that FS should not talk to her because it was "creepy that he's thirty." Another witness reported Pearson referring to FS as "fuckface."

On February 22, 2016, Sawalich emailed Pearson to provide her with an update on the investigation. Sawalich explained that she would provide a written report to the University Honor Council, which would hear Pearson's complaint. Under Logan's harassment policy, the honor council is responsible for adjudicating Title IX complaints. Trained faculty and staff members make up the council, and the five sitting members are determined by availability. Sawalich told Pearson that both she and FS would have the opportunity to read and review her final report of investigation and to comment on it. Sawalich also told Pearson that the council may ask for more information before the hearing. Sawalich stated that she hoped the honor council would render a decision by spring break. Sawalich then asked Pearson to provide her with the text messages sent by FS. She also asked Pearson whether Pearson ever told FS to leave her alone.

Sawalich met with Pearson on February 26, 2016.  Pearson said that she had deleted the text messages but that she would try to get copies from her cell phone company.  Pearson told Sawalich she could not specifically recall ever telling FS to leave her alone.  In her deposition Pearson claimed she never specifically told FS to leave her alone because she was scared of him.  [68-1 at 159-60].  Two days later, Pearson wrote Sawalich that she was unable to timely retrieve any of the text messages.  None of the text messages between FS and Pearson and FS and Kirkpatrick are part of the record in this case.

Sawalich prepared a written report of her investigation and provided it to the honor council and to Pearson and FC.  [61-46].  The report describes Pearson's allegations, the steps taken to investigate the allegations, and the witness interviews.  It does not include an account of the November 12, 2015 lab incident as one of Pearson's allegations.  Pearson provided a written response to the report and did not reference the lab incident.  FS also provided a written response.   All of this information was provided to the honor council in advance of the hearing.

The five-person honor council first met on March 8, 2016, to adjudicate Pearson's complaint against FS.  Pearson attended the hearing with her mother.  As the complainant, she met with the council first.  FS was not present.  Pearson was given the opportunity to address the council without any time restrictions.  She never mentioned the lab incident to the council.  The honor council then met

separately with FS on March 10, 2016. He was accompanied by another student. He was also given the opportunity to address the council with no time limitations. After consideration, the honor council unanimously determined that FS was not responsible for harassing or stalking Pearson. Sawalich informed Pearson of the decision by email on March 11, 2016. She advised Pearson of her right to appeal the decision to the Vice President of Academic Affairs (Kimberly O'Reilly) and notified her that the council had decided that there was to be no personal contact between her and FS. Under the council's decision, Pearson and FS could use all Logan's facilities, including the library, without restriction, but they were prohibited from personal contact and instructed to ignore each other at school sponsored events. Sawalich informed FS separately by email.

Pearson and her mother met with Bradshaw and O'Reilly on March 14, 2016, to discuss the council's decision. O'Reilly told Pearson that she would need to submit a written request to review the decision and that her role was limited to a review of whether Logan's policy was followed. Pearson submitted her written request for review the next day. A few days later, Pearson emailed O'Reilly to express her continued fear of being on campus and, in particular, the library. O'Reilly responded by informing Pearson of her right to use campus security to escort her and offered her a new work study position if that would make her feel more comfortable. Based on O'Reilly's review of Pearson's appeal, O'Reilly

believed Pearson alleged that the council had not considered all of the evidence submitted to it, including text messages and an audio recording of FS. For that reason, O'Reilly stayed her decision on the appeal to allow Pearson to provide the information. After Pearson clarified that she could not provide the text messages and that there was not an audio recording of FS, O'Reilly lifted the stay and denied the appeal on April 4, 2016.

Pearson left Logan in May of 2016. She alleges that she left because she did not feel safe at Logan. She is now pursuing a different course of study at St. Louis University. Kirkpatrick also left Logan in May of 2016 and enrolled at St. Louis University because she no longer wanted to be a chiropractor.

<u>Summary Judgment Standard</u>

The standard for summary judgment is well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Littrell v. City of Kansas City, Mo.*, 459 F.3d 918, 921 (8th Cir. 2006); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 256; *Littrell*, 459 F.3d at 921. "The party opposing summary judgment may not rest on the allegations in its pleadings; it must set forth specific facts showing that there is a genuine issue for trial." *United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir. 2006) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Hitt v. Harsco Corp.*, 356 F.3d 920, 923 (8th Cir. 2004) (internal quotation marks and citation omitted). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson*, 477 U.S. at 248; *Woods*, 409 F.3d at 990.

To survive a motion for summary judgment, the "nonmoving party must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy." *Putman v. Unity Health System*, 348 F.3d 732, 733–34 (8th Cir. 2003) (internal quotation marks and alterations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. 242 at 252*; Davidson & Associates v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines*, 536 F.3d 813, 818 (8th Cir. 2008).

<u>Discussion</u>

Plaintiffs allege gender discrimination in violation of Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As a recipient of federal funds, Logan is subject to liability for violations of Title IX, but only for damages arising from its own misconduct. *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003). Here, plaintiffs contend that Logan was deliberately indifferent to their sexual harassment by FS. Student-on-student sexual harassment is included within the meaning of "discrimination" under Title IX. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). However, Logan can only be liable for student-on-student harassment if it was "(1) deliberately indifferent

(2) to known acts of discrimination (3) which occur under its control." *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001). "To be actionable an institution's deliberate indifference must either have caused the harassment or made students vulnerable to it." *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014). Plaintiffs must show that Logan had "substantial control over both [FS] and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. "In order to avoid deliberate indifference liability an institution 'must merely respond to known peer harassment in a manner that is not clearly unreasonable.'" *Roe*, 746 F.3d at 882 (quoting *Davis*, 526 U.S. at 648–49). This standard is measured in light of the known circumstances and is intended to afford flexibility to school administrators. *Davis*, 526 U.S. at 648-49.

To violate Title IX, the "acts of discrimination must be on the basis of sex." *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 864 (8th Cir. 2011) (internal quotation marks omitted). "Harassment can constitute discrimination if it is 'so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school' and if the school [] has 'actual knowledge' of the harassment." *Id.* (quoting *Davis*, 526 U.S. at 650).

Applying these standards, Logan's response to Pearson's complaint of harassment was not "clearly unreasonable" as a matter of law. As soon as Pearson

made a verbal complaint of harassment to a Logan administrator, Logan officials acted to investigate that complaint. Pearson was immediately referred to Sawalich, the Title IX coordinator, who met with Pearson the very next day and requested she file a written complaint. Sawalich thoroughly investigated Pearson's complaint, interviewing numerous witnesses and filing a comprehensive report. Sawalich also met numerous times with Pearson to keep her updated on the progress of the investigation. Although Pearson complains about the pace of the investigation, any delays in the progress of the investigation are attributed to Pearson herself. The investigation was initially stalled because Pearson did not provide her written complaint until winter break had already started. Yet Sawalich requested an interview with FS the very day classes resumed.

Pearson also ignores the fact that her request for anonymity placed enormous restrictions on the investigation. Although Sawalich did speak to FS generally about harassment of fellow students when he returned from winter break, she could not place restrictions on his ability to use the library where Pearson worked or otherwise limit his contact with Pearson without revealing that she was the complainant. Moreover, Sawalich could not question any witnesses about the interactions between Pearson and FS without revealing Pearson's identity.

In *Roe*, the plaintiff complained to the university that she was sexually assaulted by another student, but she did not identify the assailant and asked the

university not to inform her parents. 746 F.3d at 883. University officials met with her as soon as she reported the incident and informed her of available resources to help her. *Id.* After the plaintiff eventually told her parents about the rape, her parents reported it to the police and the university. *Id.* The university then began an investigation and cooperated with the police investigation as well. *Id.* The plaintiff sued the university, claiming it was deliberately indifferent to her sexual assault in violation of Title IX. In affirming the dismissal of the complaint, the Eighth Circuit Court of Appeals concluded that the university was not deliberately indifferent to plaintiff's complaint where she "expressed [her] desire for confidentiality while she was still on campus." *Id.* The same is true here. Logan investigated Pearson's complaint to the extent possible consistent with her expressed desire for confidentiality, and there is no evidence from which a reasonable fact finder could conclude that it was deliberately indifferent to Pearson's complaint.

Moreover, after Pearson decided to no longer remain anonymous, Logan undertook substantial additional steps to investigate Pearson's complaint. Sawalich interviewed fifteen witnesses, barred FS from the library and undergraduate classrooms, prohibited FS from any contact with Pearson, and wrote a written report summarizing Pearson's allegations, FS's response, and the witness statements. Pearson had the opportunity to respond to the report. Logan then

adjudicated Pearson's complaint of harassment in accordance with its harassment policy.[2]  Pearson was provided with the opportunity to address the council, and did so in the company of her mother and without time limitation.  After considering all the evidence, the council decided that FS had not stalked or harassed Pearson. Pearson was then given the opportunity to appeal the decision, and did so.  When Logan believed that Pearson wanted to submit additional evidence in support of her claim, it stayed the appeal and provided her ample opportunity to do so.  Only when she declined to provide any additional evidence did Logan deny the appeal. Even with the council's finding, Logan still barred FS and Pearson from any social contact and offered to switch Pearson's work study from the library to a new location to make her feel safe.

Logan's investigation of Pearson's complaint cannot be deemed "clearly unreasonable" because it failed to include the November 12, 2015 lab incident. When asked by Sawalich whether the physical contact between FS and Pearson was accidental, Pearson agreed that it could have been and then never raised the issue again, despite numerous opportunities to do so.  Pearson did not include it in her written complaint, her written response to Sawalich's report of the

[2] Pearson complains that the honor council was inadequate because one of the members once made a remark which offended some female students.  Pearson was not in the class where the remark was made and did not have this faculty member as an instructor.  No Title IX complaint was made in connection with this isolated remark.  Given that the honor council was made up of five members who unanimously concluded that FS had not harassed Pearson, Logan's response to Pearson's complaint was not "clearly unreasonable" because this faculty member sat on the honor council.

investigation, or her appeal. Moreover, she never raised the issue in any of her numerous subsequent conversations with Sawalich or any of Logan's other administrators. Although Pearson now implies that she felt unable to raise the issue, there is no evidence in the record from which a reasonable fact finder could conclude that Logan's investigation into Pearson's harassment complaint was "clearly unreasonable" for failing to investigate an incident which Pearson herself deemed accidental and then never raised again.

In *Ostrander*, the Eighth Circuit held that the University of Missouri was not liable as a matter of law under Title IX for its investigation of plaintiff's complaint of sexual assault by another student while in a fraternity house. 341 F.3d at 750. After plaintiff complained of sexual assault to the university, university officials met with the local fraternity president and informed him of the allegations. *Id.* at 751. The university then contacted the national fraternity president and advised him that it expected the fraternity to investigate the allegations and require its members to attend a training program on sexual violence. *Id.* The university did not otherwise conduct an investigation or impose sanctions on the fraternity. *Id.* The Eighth Circuit acknowledged that plaintiff was "dissatisfied" with the university's response to her complaint but concluded that its response was not deliberately indifferent as a matter of law. *Id.* at 751.

Here, Logan's response to Pearson's complaint far exceeded that found sufficient in *Ostrander*. While Pearson was undoubtedly "dissatisfied" with Logan's investigation into her complaint and the ultimate finding by the honor council, Pearson's disappointment in the investigation and its outcome is insufficient to create a genuine issue for trial. Logan was not deliberately indifferent to her harassment as a matter of law. Summary judgment will be granted in Logan's favor on Pearson's Title IX claim.

Kirkpatrick's Title IX claim fails because she never made a complaint of harassment to Logan. Title IX claims based on harassment require the school to have actual knowledge of discrimination. *K.T. v. Culver-Stockton College*, 865 F.3d 1054, 1058 (8th Cir. 2017). "[T]he actual knowledge element requires schools to have more than after-the-fact notice of a single instance in which the plaintiff experienced sexual [discrimination]." *Id.* "Actual knowledge may be established where the [school] has *prior knowledge* of (1) harassment previously committed by the same perpetrator and/or (2) previous reports of sexual harassment occurring on the same premises." *Id.* (emphasis in original). The harassment must be on the basis of sex, *Wolfe,* 648 F.3d at 864, and "severe, pervasive, and objectively offensive." *Culver-Stockton*, 865 F.3d at 1059.

Kirkpatrick fails to meet this test. First, it is undisputed that she never told anyone at Logan that she wanted to make a Title IX complaint against FS. Instead,

she was interviewed by Salawich on February 4, 2016, as part of Logan's investigation into Pearson's complaint. During the February 4, 2016, meeting, Kirkpatrick told Sawalich that FS had solicited her telephone number on the first day of class, stating that he was trying to set up a study group. She gave him her telephone number, even though she thought he was "creepy." She did not see him ask anyone else in the class for a telephone number. The first Friday of classes, FS texted her asking her if she wanted to study in the library on Saturday. She responded "no," eventually telling him she had a boyfriend and then ignoring his texts. Kirkpatrick never told Sawalich that FS was following her from class or that she felt sexually harassed or stalked and never asked Sawalich to start an investigation on her behalf. There is simply no evidence from which a reasonable fact-finder could conclude that Logan had actual knowledge that Kirkpatrick was subject to sex-based discrimination based on her conversation with Sawalich. The alleged conduct described by Kirkpatrick does not rise to the severity and objectively offensive level required to be actionable as sex-based discrimination under Title IX, and Logan's response to Kirkpatrick's report was not deliberately indifferent as a matter of law.

To evade summary judgment on their claims, plaintiffs attempt to muddy the waters with unsubstantiated allegations of unrelated discrimination claims. These allegations are insufficient to create a triable issue on plaintiffs' Title IX claims as

there is no evidence of any claims of prior harassment by FS[3] or even student-on-student harassment such that Logan could be said to meet the prior knowledge element required to establish liability.[4] *See Culver-Stockton*, 865 F.3d at 1059.

As Logan was not deliberately indifferent to plaintiffs' allegations of harassment as a matter of law, summary judgment will be entered in its favor on plaintiffs' Title IX claims.

Plaintiffs also bring claims for negligence and premises liability under Missouri law, arguing that Logan had a responsibility to protect them from harassment and failed to do so. To establish liability under either claim, plaintiffs must demonstrate that Logan had a duty to protect them from injury. *Johnston v. Warren County Fair Ass'n, Inc.*, 110 F.3d 36, 38 (8th Cir. 1997) (negligence); *Ostrander*, 341 F.3d at 749 (premises liability). Whether a duty exists is a question of law. *Lopez v. Three Rivers Elec. Coop.*, 26 S.W.3d 151, 155 (Mo. banc 2000). "[S]ince the late 1970s, the general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students." *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003)

---

[3] Although some of the witnesses interviewed in connection with Pearson's complaint alleged that FS was "creepy" or made them feel uncomfortable, these statements were made to Logan *after* Pearson first complained about FS, not before.

[4] Plaintiffs make much of the fact that a complaint of pregnancy discrimination was filed against Logan in 2013, but this complaint – even if well-founded – does not create a triable issue as to whether Logan was "deliberately indifferent" to plaintiffs' complaints of student-on-student harassment.

(citing authorities) (emphasis omitted); *Nickel v. Stephens College*, 480 S.W.3d 390, 401 (Mo. Ct. App. 2015) (citing *Freeman* with approval for the proposition that in Missouri, "no special relationship exists between a college and its students even when it comes to matters of safety."). In Missouri, the general rule is that an owner or possessor of a premises is under no duty to protect an invitee from criminal acts of third persons, because such criminal acts are rarely foreseeable. *L.A.C.ex real D.C. v. Ward Parkway Shopping Ctr. Co*., L.P., 75 S.W.3d 247, 257 (Mo. 2002).

Missouri recognizes two "special facts and circumstances" exceptions to the general no-duty rule. *Ostrander*, 341 F.3d at 749. "Under the first exception, a duty may arise when a person, known to be violent, is present on the premises or an individual is present who has conducted himself so as to indicate danger and sufficient time exists to prevent injury." *Id.* (internal quotation marks and citation omitted). "Under the second exception, business owners have a duty to protect invitees from the criminal acts of unknown third persons in circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury." *Id.* (internal quotation marks and citation omitted). "Courts have required proof of specific incidents of violent crimes on the premises that are sufficiently numerous and recent to put a defendant on notice, either actual or constructive, that

there is a likelihood third persons will endanger the safety of defendant's invitees." *Id.* (internal quotation marks and citation added).

Plaintiffs have not demonstrated that Logan owed them a duty of care to protect them from student-on-student harassment. As such, their state law claims for negligence and premises liability fail as a matter of law. There is no evidence that anyone had ever complained to Logan about FS before Pearson, and there is no evidence of specific incidences of student-on-student harassment that are "sufficiently numerous and recent" such that Logan had either actual or constructive notice that plaintiffs were likely to be harassed. *See Ostrander*, 341 F.3d at 749 (affirming summary judgment in favor of premises possessor on premises liability claim where there was no evidence of prior sexual misconduct at the premises or prior complaints of sexual misconduct by assailant). *Id.* Plaintiffs' unsubstantiated allegations of unrelated discrimination claims are insufficient to create a triable issue on their state law claims. These allegations are too remote in time, are unrelated to the claims made in this case,[5] and involve a former faculty member and a past member of Logan's Board of Trustees, not student-on-student harassment. As plaintiffs have failed to demonstrate that Logan owed them a duty

---

[5]As with the Title IX claim, a complaint of pregnancy discrimination does not create a triable issue as to whether Logan had sufficient notice of student-on-student sexual harassment such that it owed plaintiffs a duty to protect them against harassment under state law.

to protect them from student-on-student harassment, Logan is entitled to judgment as a matter of law on plaintiffs' negligence and premises liability claims.

As I am granting Logan's motion for summary judgment, I will deny the motion to strike plaintiffs' affidavits as moot. In deciding this motion, I reviewed the entirety of the record and relied only upon those facts which are genuinely uncontroverted. To the extent plaintiffs contradicted their prior deposition testimony by later-filed affidavits, I relied upon plaintiffs' deposition testimony instead of the affidavits. *See Menz v. New Holland North America, Inc.*, 507 F.3d 1107, 1113 (8th Cir. 2007) (party cannot create genuine issue of fact by attempting to contradict previous testimony with later-filed affidavit).

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [58] is granted, and plaintiffs' complaint is dismissed with prejudice.

**IT IS FURTHER ORDERED** that the motion to strike [81] is denied as moot.

**IT IS FURTHER ORDERED** that defendant's request for a status conference [86] is denied as moot.

A separate Judgment in accord with this Memorandum and Order is entered this same date.



_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 31st day of July, 2018.